1 **WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Donna Manriquez, | No. CV-09-00099-PHX-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| Abbott Laboratories Extended Disability Plan, | |
| Defendant. | |

Pending before the Court are Motions for Summary Judgment filed by Plaintiff Donna Manriquez ("Manriquez") (Doc. 42) and Defendant Abbott Laboratories Extended Disability Plan ("the Plan") (Doc. 41). As set forth below, the Court denies both Motions and remands for proceedings consistent with this Order.[1]

**BACKGROUND**

In November 2005, Manriquez began working as an Occupational Health Nurse at an Abbott Laboratories ("Abbott") facility. (Doc. 43 at ¶ 4). As an Abbott employee, Manriquez was covered by the Plan, which was established for providing both short-term and long-term disability benefits to eligible employees. (*Id*. at ¶ 6). Abbott funds the Plan

---

[1] Manriquez's request for oral argument is denied because oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

through company contributions, which are held in a trust fund and used to pay benefits and operating expenses. (*Id.* at ¶ 7). Under the terms of the plan, Lois Lourie ("Lourie"), Divisional Vice President of Benefit and Wellness at Abbott Laboratories, is the Plan Administrator. (*Id.* at ¶ 9). The terms state,

> The Plan Administrator will have full power to administer the Plan in all of its details, subject, however, to requirements of ERISA. Plan benefits will be paid only if the Plan Administrator decides, in his or her sole discretion, that the applicant is entitled to them.

(*Id.* at ¶ 21). Additionally, the Plan gives the Administrator authority to delegate Claim Administration to a third party. (Doc. 29, Ex. 1). Pursuant to this authority, the Plan Administrator delegated Claim Administration to Matrix Absence Management, Inc. ("Matrix") and gave Matrix discretionary authority to make initial determinations relating to claims for benefits under the Plan. (Doc. 43 at ¶¶ 11–12).

According to the Plan, an employee receives benefits if the Plan Administrator concludes, based on the relevant evidence, that the employee is disabled. The Plan states that "disabled" or "disability" means:

> [T]hat the Participant requires Regular Care and medical evidence indicates that, due to a Sickness or Injury, the Participant is completely prevented from performing all the duties required to be performed in the Participant's own occupation or employment.

(*Id.* at ¶ 15). Under the Plan, a Participant receives "Regular Care" when he or she,

> [P]ersonally visits a Physician as often as is medically required, according to generally accepted medical standards and consistent with the stated severity of his or her medical condition to effectively manage and treat his or her Sickness or Injury.

(*Id.* at ¶ 17). The Plan defines a "Physician" as "a legally qualified and licensed Physician recognized by the state board to practice medicine in a designated field or specialty who is practicing within the scope of his or her license." (*Id.* at ¶ 16). Provided that each of these requirements is met, the Plan Administrator has discretion under the Plan to grant or deny benefits. (*Id.* at ¶ 21).

On December 1, 2006, Manriquez filed a request for a Short Term Leave of Absence with Matrix. (*Id.* at ¶ 61). Ten days later, Manriquez's treating physician, Dr. Deborah

1  Metzger (a gynecologist), submitted a certification letter describing Manriquez's alleged
2  disabling conditions, including Lyme disease, babesiosis, migraines, fatigue, and debilitating
3  pain. (*Id.* at ¶ 62, Doc. 42, Ex. 1 at ¶ 2). On December 14, Matrix, with authority from the
4  Plan Administrator, approved Manriquez's request. (Doc. 43 at ¶ 63). The next day, Matrix
5  requested copies of Dr. Metzger's reports to determine whether Manriquez was eligible for
6  benefits under the Short Term Medical Leave of Absence Program. (*Id.* at ¶ 64). Upon
7  review of the reports, Matrix indicated that it was unable to determine what had caused
8  Manriquez to become unable to work in November 2006; nonetheless, Manriquez was
9  approved for short term benefits. (*Id.* at ¶¶ 66–67).

10  On April 13, 2007, Manriquez filed for Long Term Disability under the Plan. (*Id.* at
11  ¶ 69). In connection with her application for Long Term Disability, Manriquez underwent
12  a series of medical tests, including blood draws, SPECT scans, MRI scans, and several
13  physical exams. As of June 2007, Manriquez's treating physicians, Dr. Metzger, Dr. Steven
14  Harris (a family practitioner), and Dr. Stephen Flitman (a neurologist), each concluded that
15  she was unable to work due to debilitating pain and mental anxiety stemming from a slew
16  of potential infectious diseases, primarily Lyme disease. (Doc. 42, Ex. 1 at ¶¶ 27–48). On
17  two separate occasions, Manriquez tested positive for Lyme disease using a non-CDC
18  approved test. (*Id.* at ¶ 2).

19  Manriquez, however, also tested negative for Lyme disease under a Center for Disease
20  Control test. (Doc. 28, Ex. 2). Thus, Matrix sought an independent evaluation of
21  Manriquez's condition and, through a third-party provider, retained Dr. Gary J. Dilla (a
22  physical medicine and rehabilitation specialist) to conduct an Independent Medical Exam
23  ("IME") of Manriquez. (Doc. 43 at ¶ 80). Dr. Dilla performed the IME on June 7 and
24  concluded that, "[f]rom a pure physical medicine and rehabilitation perspective, and for that
25  matter, from a neurological perspective based on the clinical evaluation of Dr. Flitman, there
26  appears to be no evidence of a 'disabling condition' as outlined in the referral letter." (Doc.
27  30, Ex. 1). Dr. Dilla noted, however, that "[t]he subjective complaints of this individual, and
28  the diagnoses outlined in the medical records, [were] beyond the scope of [his] medical

practice" because he lacked the requisite knowledge about Lyme disease and babesiosis to render an informed diagnosis. *Id.* Dr. Dilla accordingly recommended that Manriquez seek advice and treatment from an internal medicine specialist or infectious disease specialist to confirm whether her Lyme disease and babesiosis diagnoses rendered her disabled. *Id.*

On June 29, Matrix denied Manriquez's claim for Long Term Disability Benefits. In its denial Letter, Matrix summarized the medical reports and concluded that there was insufficient evidence to support a disability claim. The letter stated,

> The basis of our decision, in large part, comes down to your self-reported complaints versus how those complaints have been objectively quantified to support a disability. The IME confirms that your claim is essentially based on those self-reported complaints and could not correlate those complaints to any objective medical evidence.

(Doc. 30, Ex. 2). The denial further stated, "It is unclear how appropriate treatment for [L]yme disease can be determined or established by a 'gynecological medical practice for women.'" (Doc. 30, Ex. 2). The letter permitted Manriquez to file a written request for review of the denial and to submit additional medical information from an "appropriate medical provider for your claimed conditions, such as an internal medicine specialist with extensive training and experience in the subspecialty of infectious disease." *Id.*

On November 4, 2007, Manriquez appealed the denial of benefits and provided supplemental medical information from Drs. Metzger and Flitman. Additionally, Manriquez included medical reports from Dr. Stephen Fry (a general practitioner), Richard Randall (a physical therapist), Marc Walter, Ph.D. (a neuropsychologist), and Robin Generauz, Ph.D. (a vocational expert). All of these individuals indicated that Manriquez suffered from a series of medical ailments preventing her from performing any job. (Doc. 42, Ex. 1 at ¶¶ 37–57). In considering Manriquez's appeal, Matrix, through a third party provider, employed Dr. Howard Choi (a physical medicine and rehabilitation specialist) to conduct peer reviews of her physicians' conclusions. (Doc. 43 at ¶ 118). Upon review, Dr. Choi concluded that there was no objective medical evidence indicating that Manriquez was physically or mentally impaired. (*Id.* at ¶ 131). He further concluded that Manriquez's tests had been misinterpreted and that she had been receiving improper treatment for her alleged

ailments. (*Id.* at ¶ 135). Dr. Choi conceded, however, that Manriquez's infectious disease diagnoses were "beyond [his] area of training and expertise to make a firm determination on this issue." (Doc. 31, Ex. 3). Matrix subsequently retained Dr. Leonid Topper (a neurologist) to conduct additional peer reviews of Manriquez's case. (*Id.* at ¶ 143). Dr. Topper came to similar conclusions as Dr. Choi, determining that Manriquez's medical evidence gave no clear indication as to why she became unable to work or that she was functionally impaired from performing her job. (*Id.* at ¶ 151). Dr. Topper also noted, "considering [that Manriquez is] suspected [of having] three infectious diseases (Lyme, Babesiosis, and Bartonelliasis), a consultation with [an] infectious disease specialist would be expected." (Doc. 32, Ex. 3). Following the peer reviews, Manriquez's physicians reaffirmed their original diagnosis that she had Lyme disease and was functionally impaired from performing her job.

Matrix denied Manriquez's appeal on April 21, 2008. (Doc. 43 at ¶ 163). In the denial letter, Matrix summarized the evidence from all of the aforementioned medical professionals and concluded that the evidence did not provide "support for what changed to cause Ms. Manriquez to stop working [on] November 30, 2006. The medical information does not support a functional impairment that would have caused her to stop working." (Doc. 32, Ex. 3). The letter also stated,

> It does not appear that Ms. Manriquez is receiving appropriate treatment for her medical conditions. While Ms. Manriquez's providers may be practicing within the scope of their licensing, the peer reviewers do recommend that Ms. Manriquez be treated or at least evaluated by an infectious disease specialist.

*Id.* Nine days later, Manriquez filed a final appeal directly to the Plan, but she provided no additional medical evidence. (Doc. 43 at ¶ 170).

During the course of the final appeal, the Plan asked Dr. Dilla to review the information that Manriquez had submitted since his examination of her in June 2007. (*Id.* at ¶ 178). After his August 8, 2008 review, Dr. Dilla concluded that, in spite of her new evidence, his original conclusion that she was not functionally disabled was still correct. (*Id.* at ¶180). The Plan then retained, through MES Solutions, Dr. Peter Mosbach (a

neuropsychologist) to review Manriquez's claim. Dr. Mosbach concluded that Manriquez's medical records did not indicate a physical impairment that would prevent her from performing the essential functions of her job. (*Id.* at ¶ 186). On September 22, 2008 the Plan Administrator reviewed Manriquez's entire case and affirmed the denial of benefits. Prior to the final decision, neither party consulted with an infectious disease specialist to more definitively determine whether Manriquez had Lyme disease, whether she was receiving proper treatment for her alleged infectious diseases, or whether those diseases were disabling. In the final denial letter, the Plan reasoned that, "[b]oth the IME physician in his original report and addendum and a peer reviewer opined there are no functional impairments precluding [Manriquez] from performing [her] own occupation." (Doc. 33, Ex. 1 at 62). Pursuant to her rights under the Employee Retirement Income Security Act of 1974 ("ERISA"), Manriquez timely appealed the Plans's decision to this Court on January 15, 2009.

## DISCUSSION[2]

### I. Full and Fair Review

Manriquez alleges that the Plan did not provide her with a full and fair review as required by ERISA. Specifically, Manriquez alleges that the Plan violated 29 C.F.R. § 2560.503-1(h)(3) because it did not consult with the proper medical personnel in making an adverse determination and because it consulted with Dr. Dilla during both the initial denial and the final appellate decision. Manriquez further alleges that the Plan denied her a full and fair review because it improperly construed the term "Physician" to require her to consult with an infectious disease specialist. The Court agrees.

First, it appears that the Plan misconstrued the term "Physician" to require Manriquez

---

[2]When, as here, "a plan administrator has failed to follow a procedural requirement of ERISA, the court may have to consider evidence outside the administrative record." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972–73 (9th Cir. 2006). Accordingly, on review, this Court may consider not only the administrative record submitted by the parties, but also evidence that would "recreate what the administrative record would have been had the procedure been correct." *Id.* at 973.

- 6 -

to consult with an infectious disease specialist prior to being eligible for benefits. The Ninth Circuit has been very clear that a plan "administrator lacks discretion to rewrite the Plan." *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996) (citing *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995) (holding that a "claims administrator's decision is arbitrary and capricious where new requirements for coverage are added to those enumerated in the plan")). The Plan defines "Physician" as "a legally qualified and licensed Physician recognized by the state board to practice medicine in a designated field or specialty who is practicing within the scope of his or her license." (Doc. 43 at ¶ 16).

In considering Manriquez's initial claim for benefits, Matrix stated, "It is unclear how appropriate treatment for Lyme disease can be determined or established by a 'gynecological medical practice for women.'" (Doc. 30, Ex. 2). In its second denial letter, Matrix conceded that Manriquez's providers "may be practicing within the scope of their licensing," but nonetheless denied Manriquez's claim because "the peer reviewers [recommended] that [she] be treated or at least evaluated by an infectious disease specialist." (Doc. 32, Ex. 3). In the final denial letter, the Plan denied benefits because "there [was] no evidence from an infectious disease specialist to support" Manriquez's claims. (Doc. 33, Ex. 1). In effect, the Plan denied Manriquez's claims not because she was receiving improper treatment, but rather because her claim was not supported by the diagnosis of an infectious disease specialist. Nothing about the plan language, however, prohibits a claim from being based on the professional opinion of a physician as opposed to a board-certified specialist. Thus, the Plan unfairly interpreted the plain language to require Manriquez to produce additional evidence from medical experts. Similarly, in *Saffle*, the Ninth Circuit found that an interpretation of "completely unable" to include "even with reasonable accommodations" was inconsistent with the plain language of the plan, which warranted a remand. 85 F.3d at 459. The Plan's interpretation of the plan appears to have rewritten the plain language in a manner expressly forbidden by the Ninth Circuit, and therefore denied Manriquez a full and fair review of her

claim.[3]

Next, Manriquez alleges that the Plan violated 29 C.F.R. 2560.503-1(h)(3)(iii). That section states a plan administrator must,

> Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and expertise in the field of medicine involved in the medical judgment.

29 C.F.R. § 2560.503-1(h)(3)(iii). Although the Court disagrees with Manriquez's assertion that this provision affirmatively imposed a burden on the Plan to consult with an infectious disease specialist, it does appear that the admissions of the Plan's own doctors indicate that they do not have "appropriate training and expertise in the field of medicine involved in the medical judgment" to satisfy the requirements of the regulation.

For instance, in his IME report, Dr. Dilla stated that Manriquez's complaints are "beyond the scope of my medical license." (Doc. 30, Ex. 1). Dr. Choi stated that "it is beyond my area of training and expertise, however, to make a firm determination" as to whether Manriquez had disabling infectious diseases. (Doc. 31, Ex. 3). And although Dr. Topper does not explicitly say he is not qualified to assess Manriquez's infectious diseases, he indicates that a "consultation with an infectious disease specialist would be expected." (Doc. 32, Ex. 3). Thus, it appears that the Plan has relied on doctors who, by their own admission, are not capable of rendering an informed decision as to whether Manriquez suffers from debilitating infectious diseases. Accordingly, the Plan violated the terms of ERISA by relying on unqualified medical opinions in making its adverse decision. This does

---

[3] The Plan's assertion that this Court cannot address Manriquez's argument that the Plan misapplied the term "Physician" because she did not raise it below is without merit. The Plan's reliance on *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469 (9th Cir. 1994) to the contrary is misplaced, as *Taft* was recently abrogated by the Ninth Circuit in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006). Contrary to *Taft*, *Abatie* holds that "if the administrator did not provide a full and fair hearing, as required by ERISA . . . the court must be in a position to assess the effect of that failure and, before it can do so, must permit the participant to present additional evidence." *Id.* at 973. Accordingly, the Court finds that its consideration of Manriquez's argument is valid.

not necessarily mean that the Plan must engage a board-certified specialist to evaluate Manriquez's claims or that the Plan's doctors cannot render a judgment as to whether Manriquez's doctors are qualified. Instead, the Court finds only that the Plan is required to consult with medical practitioners who have "appropriate training and expertise" in the medical fields pertinent to their review. *See Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 158 (5th Cir. 2009) (ordering remand where the plan failed to consult with the proper medical personnel).

Finally, Manriquez asserts that consultation with Dr. Dilla in both the initial claim denial and in the final appeal violated 29 C.F.R. §2560.503-1(h)(3)(v). That provision provides that a plan administrator must,

> Provide that the health care professional engaged for the purposes of consultation under paragraph h(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual . . . .

29 C.F.R. §2560.503-1(h)(3)(v). It appears that the Plan violated paragraph (h)(3)(v) by consulting with Dr. Dilla at two levels of Manriquez's claim. The final denial letter to Manriquez stated, "Abbot requested that Dr. Dilla review all medical records" that were submitted during the development of Manriquez's case and that Dr. Dilla's opinion "remained unchanged." (Doc. 33, Ex. 1). The letter further stated, "the IME physician [Dr. Dilla] in his original report *and addendum* . . . opined there are no functional impairments precluding [Manriquez] from performing [her] own occupation." *Id.* (emphasis added). Although the Plan asserts in its briefing that the final decision was not impacted by Dr. Dilla's opinion, the denial letter itself contradicts that assertion and instead indicates that the Plan's final decision was unduly influenced by a second consultation with Dr. Dilla. In *Pitts v. Prudential Ins. Co. of Am.*, the Southern District of Ohio found that it "is the most fundamental of procedural defects" where an insurer "base[s] its decision on the opinion of its hired health care professional during the initial review and on appeal." 534 F. Supp. 2d 779, 791 (S.D. Ohio 2008). Though the Plan also consulted with new physicians on appeal, the potential violation of consulting with Dr. Dilla on two occasions, combined with the other

1 procedural violations discussed *supra*, demonstrates that the Plan denied Manriquez a full
2 and fair review. Because the Plan has not complied with the terms of ERISA, it is not
3 entitled to Summary Judgment.

4 **II.     Summary Judgment For Manriquez Is Inappropriate**

5 When reviewing a plan administrator's decision, "[t]he Supreme Court has held that
6 a denial of benefits 'is to be reviewed under a de novo standard unless the benefit plan gives
7 the administrator . . . discretionary authority to determine eligibility for benefits or to
8 construe the terms of the plan.'" *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544
9 F.3d 1016, 1023 (9th Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.
10 101, 115 (1989)). Where, as here, the plan "does grant such discretionary authority, [courts]
11 review the administrator's decision for abuse of discretion." *Saffron v. Wells Fargo & Co.*
12 *Long Term Disability Plan*, 522 F. 3d 863, 866 (9th Cir. 2008). In ERISA cases, procedural
13 violations "do not alter the standard of review unless those violations are so flagrant as to
14 alter the substantive relationship between the employer and employee, thereby causing the
15 beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 985
16 (9th Cir. 2005). A reviewing court "must consider numerous case-specific factors, including
17 the administrator's conflict of interest, and reach a decision as to whether discretion has been
18 abused by weighing and balancing those factors together." *Montour v. Hartford Life &*
19 *Accident Insurance Co.*, 588 F.3d 623, 630 (9th Cir. 2009).

20 Based on the present record, entering Summary Judgment for Manriquez would be
21 premature. Although the record indicates that the Plan has committed procedural violations
22 that have altered the substantive relationship between the parties, thus potentially altering the
23 standard of review, those violations operate in a unique manner. Here, the Plan's decision
24 to consult with Dr. Dilla, during both the initial and final rejections of Manriquez's claim,
25 and to consult with unqualified medical personnel denied her a full and fair review. Without
26 this full and fair review the Court is unable to evaluate whether Manriquez is entitled to
27 benefits under an abuse of discretion standard or a de novo review. Thus, insofar as further
28 factual development is necessary to make an informed decision, the Court finds that granting

Summary Judgment would be premature and therefore denies Manriquez's Motion.

**III. Remedy**

A district court has discretion in its choice of remedy in ERISA benefits denial cases. *See Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001); *see also Buffonage v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (holding that "the court must have 'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits"). Additionally, an "ERISA claimant whose initial application for benefits has been wrongfully denied is entitled to a different remedy than the claimant whose benefits have been terminated." *Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F. 3d 1213, 1221 (9th Cir. 2008) (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775–76 (7th Cir. 2003)). "Where an administrator's initial denial of benefits is premised on a failure to apply plan" or ERISA provisions correctly, "courts remand to the administrator to apply the terms correctly in the first instance." *Pannebecker*, 542 F.3d at 1221 (citing *Saffle*, 85 F.3d at 461 (ordering remand where an ERISA administrator "misconstrued the plan and applied a wrong standard to a benefits determination.")); *see also Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009) (holding that "where the plan administrator fails to comply with ERISA[] . . . the proper remedy is to remand the case to the plan administrator so that a full and fair review can be accomplished.") (citing *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008) (internal quotations omitted); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073–1074 (2d Cir. 1995) (remanding a case to plan administrator where the factual evidence was insufficiently developed).

The Plan failed to apply the terms of its plan properly by not following the explicit guidelines of ERISA for providing Manriquez a full and fair review of her claim. To the extent that the Plan violated 29 C.F.R. § 2560.503-1(1)(h)(3), the Plan must conduct a further review of Manriquez's claim in a manner consistent with this Order. To be clear, because Manriquez's claim is supported by physicians, the Plan may not determine that her claim fails to meet plan requirements because it is not supported by the diagnosis of an infectious

- 11 -

1 disease specialist. Furthermore, the Plan must consult with medical personnel who have some basis for rendering a judgment as to Manriquez's conditions before it denies her claim based on the absence of those conditions, and it may not consult with the same physician during both denial and review.

**CONCLUSION**

For the forgoing reasons, the Court finds that neither party has presented sufficient evidence to warrant Summary Judgment. Instead, the evidence indicates that the Plan's numerous ERISA violations prevented Manriquez from receiving a full and fair review. Accordingly, the Court remands her claim to the Plan Administrator for further proceedings consistent with this Order.

**IT IS THEREFORE ORDERED:**

1. Manriquez's Motion for Summary Judgment (Doc. 42) is **DENIED**

2. The Plan's Motion for Summary Judgment (Doc. 41) is **DENIED**

3. Manriquez's claim is **REMANDED** to the Plan Administrator to be adjudicated in a manner consistent with this Order.

4. Directing the Clerk of the Court to terminate this action.

Dated this 30th day of July, 2010.

_____
G. Murray Snow
United States District Judge